**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KAREN HOOD, et al.

v.                                                           Civil No. CCB-04-3870

LABORATORY CORPORATION OF
AMERICA, et al.

**MEMORANDUM**

Plaintiffs Karen and Scott Hood claim damages in a "wrongful birth" cause of action arising out of the birth of their son, Luke Hood, on May 3, 2002. Luke was diagnosed with cystic fibrosis shortly after his birth. The Hoods contend that but for the erroneous genetic analysis performed by Laboratory Corporation of America ("Lab Corp."), which reported that Luke did not have cystic fibrosis, the Hoods would have terminated the pregnancy.

There are two motions pending in this case: (1) Lab Corp.'s motion for summary judgment or, in the alternative, motion for partial summary judgment on damages; and (2) the Hoods' motion for partial summary judgment on the issue of liability. The motions have been fully briefed and a hearing was held on May 11, 2006. For the reasons that follow, I will deny Lab Corp.'s motion in part and will stay the remainder pending a response from the Maryland Court of Appeals to several dispositive questions raised by this case. Because the Hoods' motion depends on the resolution of the same questions, I will stay their motion as well.

**BACKGROUND**

The Hoods are Maryland residents. The Hoods had their first child, Zachary, in 1997. Zachary was diagnosed with cystic fibrosis in 1999. Cystic fibrosis is a devastating disease that

1

always is terminal.  Cystic fibrosis profoundly affects many organ systems including, in particular, the victim's lungs.  As a consequence, a cystic fibrosis sufferer is doomed to a lifetime of lung diseases, gastrointestinal diseases, pancreatic diseases, heart diseases, and diseases of other organ systems.  Cystic fibrosis sufferers rarely live beyond their mid-30s.

After Zachary was diagnosed with cystic fibrosis, the Hoods learned they both carry the recessive delta F508 mutation that is the cause of one of the most severe forms of cystic fibrosis.  A cystic fibrosis victim always must receive the gene from both his father and his mother.  Because the Hoods both are carriers, each of their pregnancies carries with it a one in four risk of giving birth to a child with cystic fibrosis.

In 1999, Mrs. Hood became pregnant.  The Hoods were referred by their Maryland obstetrician to a genetic counselor. The Hoods had genetic testing performed on the fetus and discovered that the fetus was afflicted with cystic fibrosis.  The Hoods terminated the pregnancy.

After much consideration, the Hoods both agreed that they wanted a second child and that they wanted to try to have the child naturally.  In August 2001, Mrs. Hood again became pregnant.  The Hoods once again decided to use genetic testing to determine whether the fetus was afflicted with cystic fibrosis.  The Hoods already had decided to terminate the pregnancy if the fetus tested positive for cystic fibrosis.

On November 27, 2001, an amniocentesis was performed on Mrs. Hood by Dr. Thomas Pinkert.  Before the sample was sent out for testing, the Hoods' genetic counselor, Amy Everest Kimball, spoke with a Lab Corp. genetic counselor.  Kimball told Lab Corp. that both Mr. and Mrs. Hood carried the cystic fibrosis gene.  The specimen was examined by Lab Corp. in North Carolina.

Two Lab Corp. employees -- Marcia T. Eisenberg, Ph.D. and Nicholas M. Brown, Ph.D. – reviewed the chromatograph of the fetus's DNA.  Based on their analysis, on December 5, 2001, Lab Corp. issued a report that stated the amniocentesis was negative for 31 common cystic fibrosis genetic mutations.  According to the report, "[t]his fetus is not expected to be a carrier of cystic fibrosis or be affected by cystic fibrosis."  Pl. Opp., Ex. G.  The report also noted that both parents of the fetus are carriers of the delta F508 mutation.  Based on Lab Corp.'s report, the Hoods elected to continue the pregnancy.  On May 3, 2002, Luke Hood was born in Maryland.

When Luke Hood was three months old, the physician at Johns Hopkins University Hospital caring for his older brother performed a "sweat test" on Luke.  This is a common test to identify cystic fibrosis sufferers.  Luke was found to be positive for cystic fibrosis.

On September 10, 2002, Lab Corp. issued a corrected report.  The original chromatograph clearly demonstrated that the Hoods' fetus was positive for the delta F508 mutation that causes cystic fibrosis.  Dr. Eisenberg admits that the original report was incorrect because she and Dr. Brown misread the chromatograph.  Pl. Opp., Ex. E at 26.  The box containing the word "del F508" contained an asterisk, indicating that the fetus had cystic fibrosis.

Luke now lives with his parents and brother in Maryland.  He continues to see doctors in Maryland and is expected to attend school in Maryland.

Based on these facts, the Hoods assert a "wrongful birth" claim against Lab Corp., alleging that the defendant's negligent analysis of Karen Hood's amniocentesis sample proximately caused them to have a child that they otherwise would have aborted.

3

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

I.   Lab Corp.'s Motion for Summary Judgment

Lab Corp. first argues that the Hoods' cause of action is appropriately characterized as a breach of contract, not a tort. According to Lab Corp., Dr. Pinkert contracted with Lab Corp. to perform genetic testing on Karen Hood's amniocentesis sample. The Hoods had no contact with Lab Corp. from retention of the sample to the time it reported its results and, at all times, Karen Hood was a patient of Dr. Pinkert, not Lab Corp. Accordingly, Karen Hood is best characterized as a third-party beneficiary of the contract between Dr. Pinkert and Lab Corp. Under Maryland choice of law principles, the "place of contracting" or *lex loci contractus* determines which state law to apply. *Rouse Co. v. Federal Ins. Co.,* 991 F.Supp. 460 (Md. 1998). In this case, the acceptance, performance, and breach of the contract between Dr. Pinkert and Lab Corp. all occurred at Lab Corp.'s North Carolina laboratory. Thus, according to Lab Corp., North Carolina law should control the outcome of this case.

Lab Corp.'s analysis is incorrect. As the Maryland Court of Appeals has recognized, "[t]he great majority of courts ... have concluded that medical malpractice actions sound in tort, and not in contract." *Benson v. Mays,* 227 A.2d 220, 223 (Md. 1967); *see also Dingle v. Belin,* 749 A.2d 157, 164 (Md. 2000) (while "the relationship that spawns the malpractice claim is thus ordinarily a contractual one ... malpractice actions have traditionally been tort-based, the tort arising from the underlying contractual relationship."). Medical malpractice "is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability." *Benson,* 227 A.2d at 223. In this case, the Hoods allege that Lab Corp.'s erroneous interpretation of the chromatograph constituted medical negligence. Numerous courts, under similar circumstances, have found that such lab mistakes should be brought as medical negligence claims sounding in tort. *See Harms v. Lab. Corp. of*

5

*Am.*, 155 F.Supp.2d 891 (N.D. Ill. 2001) (negligence action against a laboratory for misidentifying an RH test); *Gunter v. Lab. Corp. of Am.,* 121 S.W.3d 636 (Tenn. 2003) (negligence action against a laboratory for misinterpreting a paternity test); *Limle v. Lab. Corp. of Am.,* 738 N.E.2d 890 (Ohio App. 2000) (negligence action against a laboratory for a misread Pap smear); *Watts v. Lab. Corp. of Am.,* 139 S.W.3d 534 (Ky. App. 2004) (negligence action against a laboratory that diagnosed a malignant tumor as benign); *see also Gilliam v. Roche Biomedical Labs., Inc.,* 989 F.2d 278 (8th Cir. 1993) (negligence action against a laboratory for a misread Pap smear); *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F.Supp. 692 (E.D. Pa. 1978) (wrongful birth action based on negligent genetic test); *Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901 (Colo. 1993) (negligence action against a laboratory for misread slides); *National Health Labs. v. Ahmadi,* 596 A.2d 555 (D.C. 1991) (negligence action against a laboratory for improperly conducted blood test). Finally, if there is any doubt, the Maryland Court of Appeals has held that "[wrongful birth] cases in Maryland are embraced within the tort of negligence." *Dehn v. Edgecomb,* 834 A.2d 146, 157 (Md. 2003). The Hoods' claim, therefore, sounds in tort and is governed by the general rules of negligence.[1]

Lab Corp. asserts that even if this court were to agree with the Hoods that this is an action sounding in tort rather than contract, North Carolina law still should apply. In a diversity case such as this, the United States District Court sitting in Maryland must apply Maryland's choice of law rules. *Klaxon v. Stentor Elec. Mfg.,* 313 U.S. 487 (1941). Maryland adheres to the

---

[1] This case differs from the usual medical malpractice case because Luke Hood's injuries are genetic and therefore not caused by any act or omission by Lab Corp. Instead, Lab Corp. is accused of causing Luke Hood's birth, by failing to detect his birth defect and therefore denying his parents the opportunity to terminate the pregnancy.

*lex loci delecti* principle for all tort claims. *White v. R.J. Reynolds Tobacco Co.,* 109 F.Supp.2d 424, 427 (D.Md. 2000). Under *lex loci delecti,* the place of the last act required to give rise to the tort determines the law that should apply. *Phillip Morris Inc. v. Angeletti,* 752 A.2d 200, 231 (Md. 2000). In this case, as in all personal injury claims under Maryland law, the last act required to give rise to a tort claim is the injury. *In re Sabin Oral Polio Vaccine Products Liability Litigation*, 774 F.Supp. 952 (D.Md.1991), *aff'd,* 984 F.2d 124 (4th Cir. 1993). The injury in this matter took place in Maryland, because that is where Luke Hood was born. Indeed, the Hoods faced no financial obligation and suffered no emotional distress until Luke's birth. Thus, his birth completed the cause of action.

Lab Corp., however, asserts that North Carolina law applies to the facts of this case based on the "standard of care" exception to the general *lex loci delecti* principle that the place of the injury determines the choice of law. Specifically, Lab Corp. relies on *Farwell v. Un,* 902 F.2d 282 (4th Cir. 1990), in which survivors of a patient who committed suicide in Pennsylvania brought a wrongful death action against the patient's physician and psychiatrist, who resided in Maryland and Delaware, respectively, alleging that the defendants' negligence in failing to involuntarily commit the decedent was the proximate cause of his death. Affirming the district court's decision to apply the substantive laws of Maryland and Delaware, the Fourth Circuit reasoned that there is a "common sense" exception to the *lex loci delecti* principle:

> Where by the law of the place of the wrong, the liability-creating character of the actor's conduct depends upon the application of a standard of care, and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct, such application of the standard will be made by the forum.

*Id.* at 286-87, *quoting Restatement (First) of Conflict of Laws* § 380(2) (1934). A judge of this

court likewise adopted the "standard of care" exception in *White*, 109 F.Supp.2d 424. In *White,* the court held that although the injury occurred in Pennsylvania, Maryland law applied because most of the wrongful acts charged to defendants occurred in Maryland. *Id.* at 427. In this case, Lab Corp.'s potential liability flows from the issuance of an erroneous report by Drs. Eisenberg and Brown. Thus, the alleged breach of the standard of care occurred in North Carolina, and Lab Corp. argues that North Carolina law should dictate whether Drs. Eisenberg and Brown breached a duty owed to the Hoods.

The Hoods try to differentiate *Farwell* and *White* from this case, arguing that the "standard of care" exception only applies in wrongful death cases because of the language of Maryland's wrongful death statute. In *Farwell,* for example, the court noted that its decision to reject the general rule that the place of the injury should govern was based on the "critical factor" that the language of the Maryland Wrongful Death Statute, Md. Code Ann, Cts. & Jud. Proc. § 3-903(a), establishes that when the wrongful act has occurred in another state, the law of that state shall apply in all wrongful death cases. *Farwell,* 902 F.2d at 287. *White,* like *Farwell,* also was a wrongful death case. Similarly, while *Jones v. Prince George's County,* 835 A.2d 632 (Md. 2003) discussed *Farwell* in detail, the Maryland Court of Appeals did not even mention the possibility of a standard of care exception to *lex loci delecti* in cases that do not involve Maryland's wrongful death statute.

*Farwell,* however, concluded the "standard of care" exception should apply on two different grounds: (1) the reasoning of the *Restatement (First) of Conflicts of Law;* and (2) the plain language of the Maryland Wrongful Death Statute. In other words, the Fourth Circuit found that the Maryland Wrongful Death Statute provided grounds *in addition to,* rather than

8

*instead of*, the *Restatement (First) of Conflicts of Law*. This holding is consistent with precedent from the Maryland Court of Appeals, which has held that "[b]ecause Maryland is among the few states that continue to adhere to the traditional conflict of laws principle of *lex loci delecti,* the First Restatement of Conflict of Laws, while of merely historical interest elsewhere, continues to provide guidance for the determination of *lex loci delecti* questions in Maryland." *Angeletti,* 752 A.2d at 231, n.25. (internal citations omitted).

While the Fourth Circuit has recognized the "standard of care" exception, there is no direct Maryland judicial authority that recognizes this exception to the traditional principle of *lex loci delecti.* Indeed, in the sixteen years since the Fourth Circuit decided *Farwell,* no Maryland state court has even suggested that Maryland choice of law rules would recognize a standard of care or "common sense" exception to *lex loci delecti.* I note, moreover, that while the Maryland courts have recognized a public policy exception to choice of law rules concerning contracts, no Maryland court, to date, has recognized a public policy exception to the *lex loci delecti* rule applicable to torts. *Black v. Leatherwood Motor Coach,* 606 A.2d 295, 303 (Md. App. 1992). Nonetheless, other jurisdictions that employ the *lex loci delecti* choice of law provision have recognized the "standard of care" exception in the context of medical negligence actions that did not involve wrongful death statutes. *See, e.g., Castelli v. Steele,* 700 F.Supp 449, 454 (S.D. Ind. 1988) (to avoid "anomalous results" of applying Illinois law under *lex loci delecti* principles, applied Indiana law where alleged medical negligence occurred); *Chadwick v. Arabian Am. Oil Co.,* 656 F.Supp. 857, 860 (D.Del. 1987) (applied Saudi Arabian law to allegations of medical negligence because plaintiff received allegedly improper diagnosis in Saudi Arabia); *Bledsoe v. Crowley,* 849 F.2d 639, 642 (D.C. Cir. 1988) (finding the applicable law, under Maryland *lex*

*loci delecti* principles, is that of the "place where the wrong occurred."); *see also Klisch v. Meritcare Med. Group, Inc.,* 134 F.3d 1356, 1358 (8th Cir. 1998)*; Edwardsville Nat'l Bank and Trust Co. v. Marion Labs., Inc.,* 808 F.2d 648 (7th Cir. 1987); *Ewing v. St. Louis-Clayton Orthopedic Group, Inc.,* 790 F.2d 682, 687 (8th Cir. 1986); *Blakesley v. Wolford,* 789 F.2d 236 (3rd Cir. 1986); *Matthews v. Malkus,* 352 F.Supp.2d 398, 401-02 (S.D.N.Y. 2004); *Grover v. Isom,* 53 P.3d 821 (Id. 2002); *Dasha v. Adelman,* 699 N.E.2d 20 (Mass. App. Ct. 1998) (law of the state where the alleged negligent medical care is provided is applied under the *Restatement (Second) of Conflict of Laws* approach.).

Lab Corp. also argues that as a matter of public policy, it is more appropriate to apply the law of North Carolina in this case. According to Lab Corp., North Carolina has a much stronger interest in regulating the health care providers within its jurisdiction than Maryland. While it is reasonable to assume that Lab Corp. was familiar with the standard of care required by the State of North Carolina, it is less likely that Lab Corp. was familiar with the standard of care in Maryland.

The Hoods, by contrast, contend that it would not be unreasonable for Lab Corp. to be held to Maryland's standard of care. Unlike the physicians in *Farwell,* who appeared to have limited their practice to the state in which they resided, Lab Corp. employees hardly can be characterized as local practitioners who might be prejudiced by the application of an out-of-state standard of care. As the Hoods point out, Lab Corp. is a large, national company doing business throughout the country. It operates a nationwide network of 35 primary testing locations and more than 1,100 patient service centers, eight of which are located in Maryland within 25 miles of the Hoods' residence. Pl. Supp. Br., Ex. 1. Clearly, Lab Corp. is aware that as a result of its

wide-spread business dealings, it might be subject to suit in many different states, including Maryland. Thus, according to the Hoods, it is disingenuous for Lab Corp. to claim that its employees rely solely upon the standard of care as defined by North Carolina law merely because Lab Corp. chooses to interpret specimens in North Carolina. Indeed, if a medical testing company were only subject to the laws of the state in which the actual testing was conducted, and not the laws of the state in which its patients were located, medical testing companies would have an incentive to locate in states that provide the most protection to the company and the least protection to patients. The Hoods contend that this incentive to engage in "forum shopping" is contrary to public policy.

Deciding the choice of law issue is critical, because if this court were to apply the laws of North Carolina, the Hoods would not have a cause of action. In *Azzolino v. Dingfelder,* 337 S.E.2d 528 (N.C. 1984), the Supreme Court of North Carolina considered, and rejected, the cause of action that the Hoods assert in this case on the grounds that it was "unwilling to say that life, even life with severe defects, may ever amount to a legal injury." *Id.* at 533-34. In other words, the *Azzolino* court held that the parents of a child born with severe birth defects did not suffer from any legally cognizable injury. The *Azzolino* court rejected the parents' wrongful birth claim because it did not want to place the "heavy burden" on physicians and health care professionals to become legally responsible for genetic abnormalities they did not cause. *Id.* at 532. The court also rejected the wrongful birth claim because the legislature "has tended to discourage holding physicians and nurses liable for not acting in a manner which will result in abortion." *Id.* at 537. *Azzolino* does not, however, relieve geneticists of all responsibility to properly perform and report the results of genetic tests. Indeed, if Lab Corp. had mistakenly

11

interpreted and reported the results of the Hoods' genetic test before Karen Hood became pregnant, the Hoods would have a cause of action for "wrongful conception" under North Carolina law. *Gallagher v. Duke Univ.*, 852 F.2d 773 (4th Cir. 1988). Nonetheless, under the reasoning of *Azzolino,* Lab Corp.'s mistake, while wrongful, does not provide the Hoods with a cause of action because Luke Hood's birth -- unlike Karen Hood's pregnancy -- is not a legally cognizable injury.

The Hoods argue that even if the court were to find that pursuant to the standard of care exception, North Carolina law should control the outcome of this case, the court should refuse to apply it on the basis of public policy. None of the relevant case law of the two states establishes any difference in the standard of care itself, *i.e.,* that the Lab Corp. doctors should not have interpreted the chromatograph as they did. Rather, Maryland and North Carolina simply provide dramatically different legal consequences for violating the standard of care when interpreting a genomic lab specimen obtained during pregnancy.

Maryland has enacted a statute that protects the rights of parents to terminate a pregnancy when a fetus is affected by a genetic defect or serious abnormality or deformity. *See* Md. Code, Health Gen., § 20-209. Consistent with this statute, the Maryland Court of Appeals has decided that Maryland citizens may recover damages for the negligent interpretation of a prenatal genomic test which results in the birth of a child with the genetic disease being tested for. *Reed v. Campagnolo,* 630 A.2d 1145 (Md. 1993). The North Carolina Supreme Court's decision, by contrast, prohibits North Carolina citizens from seeking redress in the same situation.[2] *Azzolino,*

---

[2] Noting that the North Carolina legislature "has not spoken directly to the issues," the *Azzolino* court nonetheless explained that "to the extent our legislature has spoken to date, it has tended to discourage holding physicians or nurses liable for not acting in a manner which will

337 S.E.2d at 537. Thus, to apply North Carolina's family planning policy and deny the Hoods, who are Maryland residents, recovery in this case would be contrary to Maryland public policy. Indeed, if there was any doubt, the Maryland Court of Appeals considered, and rejected, the reasoning of *Azzolino* as "contrary to Maryland law." *Reed,* 630 A.2d 1150. As such, the Hoods argue that, under these circumstances, the court should refuse to apply the standard of care exception because it would result in a violation of Maryland's strong public policy, which protects the rights of parents to make their own family planning decisions. *See e.g., Bethlehem Steel Corp. v. G.C. Zarnas & Co.,* 498 A.2d 605, 608 (1985) (holding that choice of law rules can be deemed inapplicable when enforcing a contract would be against Maryland public policy).

In summary, it is unclear what choice of law rule the court should apply in this case, which involves important issues of state public policy. Pursuant to the Maryland Uniform Certification of Questions of Law Act, the Maryland Court of Appeals is permitted to answer a question of law certified to it by a court of the United States "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann, Cts. & Jud. Proc. § 12-603. I therefore seek counsels' comments on the following questions, which I propose to certify to the Maryland Court of Appeals pursuant to this statute:

1. In a case where a national medical laboratory collects specimens in Maryland and erroneously interprets them in another state, causing injury in Maryland to Maryland

---

result in abortion." *Azzolino,* 337 S.E.2d at 537.

residents, should this court follow the "standard of care" exception in the *Restatement (First) of Conflicts of Law* § 380(2) and apply the substantive law of the state where the medical care was rendered?

2. Does denying Maryland residents the right to bring a wrongful birth action by applying North Carolina law violate the public policy of the State of Maryland?

Lab Corp. further argues that even if Karen Hood has a cause of action, Scott Hood does not. To be more precise, Lab Corp. asserts that Scott Hood is not entitled to damages on two grounds. First, citing *Planned Parenthood v. Casey,* 505 U.S. 833, 898 (1992), Lab Corp. argues that Scott Hood has no enforceable right concerning his wife's personal choice to abort a fetus. As such, Scott Hood cannot pursue a claim for wrongful birth, because the decision to abort was solely Karen Hood's. Even though Karen Hood was the ultimate decision-maker, however, Lab Corp.'s alleged negligence prevented the Hoods from jointly deciding whether to terminate their pregnancy in order to avoid the mental anguish and enormous financial burden associated with bearing a child with cystic fibrosis. Indeed, while the Supreme Court has held that a father has no legally enforceable right to either compel or prevent an abortion, it also has acknowledged that the father has an interest in participating in the decision. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 69-70 (1976).

Second, citing *Dehn v. Edgecomb,* 865 A.2d 603 (Md. 2005), Lab Corp. asserts that Scott Hood does not have a valid claim under Maryland law, because Maryland does not support a cause of action for a patient's spouse, even when the spouse is affected or where it was

reasonably foreseeable that a spouse would be affected by a doctor's negligence.[3]

In *Dehn,* a husband and wife brought a medical malpractice action against the husband's physician alleging negligent post-operative care following a vasectomy, which caused the wife to become pregnant.  The *Dehn* court held that "[i]t is a general rule that recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and the patient." *Id.* at 620.   Because the husband's primary care physician had never seen, treated, or even met the wife, the physician did not have a professional relationship with her and, therefore, owed no duty to her.  *Id.* at 622.  Here, Lab Corp. relies on *Dehn* to argue there was no doctor-patient relationship between Scott Hood and Lab Corp. because it contracted with Karen Hood's obstetrician to analyze *her* amniocentesis specimen. Lab Corp.'s duty therefore extended only to Karen Hood, and not Scott Hood, with whom Lab Corp. had no contact whatsoever.

*Dehn* also rejected the argument that the wife had a special relationship with the doctor because, while she did not have a direct relationship, it was reasonably foreseeable that

---

[3] *Reed v. Campagnolo,* 332 Md. 226 (Md. 1993) -- the case in which Maryland first recognized the tort of wrongful birth – does not explicitly address the issue of whether a father would have a cause of action in a wrongful birth case.  *Reed* does, however, state that "[e]ven though the physical forces producing [the child's] birth defects were already in operation at the time of the alleged negligence by the physicians, under the chain of causation alleged by the Reeds the physicians could have prevented the harm to the *parents.*"  *Id.*  at 1152 (emphasis added).  The few subsequent cases concerning this tort do not endorse the father's cause of action.  Indeed, the court in *Dehn* clarified the court's prior ruling in *Jones v. Malinowski,* 473 A.2d 429 (Md. 1984) (wrongful conception action resulting from a negligent sterilization, which held that "the parents," not the single parent who underwent the sterilization, were entitled to recover child-rearing costs).  According to *Dehn,* "Most assuredly, *Jones v. Malinowski* did not hold, as Mrs. Dehn now maintains, that in a suit for wrongful birth based on a doctor's negligence each parent has an independent right to sue the defendant-doctor regardless of whether that parent had ever been in a doctor-patient relationship with the defendant or not." *Dehn,* 865 A.2d at 624 (quoting *Dehn v. Edgecomb,* 152 A.2d 146, 162-63 (2003)).

negligence in the care of a vasectomy could result in the wife's pregnancy. *Id.* at 625-26. According to the court, "mere foreseeability of harm or injury is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm." *Id.* at 625. Applying *Dehn* to the facts of this case, Lab Corp. argues that it was even less foreseeable that Scott Hood would be harmed by Lab Corp.'s negligence because: (1) the defendant doctor in *Dehn* had direct dealings with the patient and presumably would know of the patient's marital status in providing vasectomy care to his patient; (2) Lab Corp. had no direct contact with Karen Hood to discover her marital status; and (3) no special relationship between Lab Corp. and Scott Hood could emerge because Lab Corp. had no notice of his involvement. Even if Lab Corp. was aware of Karen Hood's marital status, moreover, it still might not owe a duty to Scott Hood. As the *Dehn* court held, "[a] duty of care does not accrue purely by virtue of the marital status of the patient alone; some greater relational nexus between doctor and patient's spouse must be established...." *Id.* at 627.[4]

The Hoods attempt to differentiate the facts of their case from *Dehn* by showing that there was a relationship between Scott Hood and Lab Corp. In this specific case, they argue, Lab Corp. knew that its services were for the benefit of both parents. Indeed, the cystic fibrosis test only was necessary because the combination of Karen and Scott Hoods' DNA created the possibility of cystic fibrosis in their children. Lab Corp. therefore knew that it was examining

---

[4] *Dehn* also rejected the argument that because the father shares the legal obligation to provide for the child's care and support, he has the right to seek damages against the physician. *Dehn,* 865 A.2d at 623. Other courts, in wrongful birth actions, have found that the father's legal obligations to the child do provide the father with a cause of action. *See DiNatale v. Lieberman,* 409 So.2d 512, 513 (Fla. Dist. Ct. App. 1982); *Stribling v. deQuevedo,* 432 A.2d 239 (Pa. Super. 1980).

the combination of DNA from both parents.  The Hoods' genetic counselor also notified Lab Corp. that she was providing the genetic make-up of Karen and Scott Hood with the amniocentesis sample.  Pl. Opp., Ex. J.  When Lab Corp. provided its results, its report noted that both "parents" were carriers of the delta F508 mutation and it made a recommendation for genetic counseling to Karen Hood and her partner. *Id*., Ex. G.

Likewise, the Hoods assert that, in general, genetic testing services are provided to both parents, not just the mother.  *See id.,* Ex. I at 15, 26, 33.  Lab Corp. markets these testing services to parents for the specific purpose of offering to help *parents* avoid the burden of having a child with cystic fibrosis.  *Id.* at 24.  In other words, Lab Corp.'s family planning services are marketed to couples, not just mothers.

Accordingly, it could be argued that because Lab Corp. rendered services to both Karen and Scott Hood, both parents had a relationship with Lab Corp., and Lab Corp. therefore owed a duty of care to both parents.  This case, moreover, does not implicate the policy concerns articulated in *Dehn.*  The *Dehn* court worried that imposing a common law duty on the physician would "expand traditional tort concepts beyond manageable bounds" because "the rationale for expanding the duty would apply to all potential sexual partners...." whom the patient encounters after a vasectomy. *Dehn,* 865 A.2d 627.  Here, by contrast, the only parties who are owed a duty are parents who retain Lab Corp.'s genetic testing services, a much smaller group of potential plaintiffs.

In summary, this is also a close call under Maryland law, particularly given the Maryland Court of Appeals' reluctance to impose a duty of care in the absence of a direct doctor-patient relationship.  *Id.* at 621.  The key question therefore appears to be whether Scott Hood had a

relationship with Lab Corp. such that Lab Corp. owed him a duty of care. Accordingly, it would be appropriate to certify a question to the Maryland Court of Appeals on this issue. I ask for comments from parties' counsel on the following question:

3. In a case where a laboratory analyzes a woman's amniocentesis specimen for the purpose of genetic counseling for both parents, does the laboratory have a relationship that gives rise to a duty of care only with the mother, or with both the mother and father, and if the latter, does the father have a cause of action against the laboratory if it erroneously analyzes the specimen?

Lab Corp. next argues that even if the court were to find that Scott Hood has a cause of action, Karen and Scott Hood would only be entitled to one application of Maryland's statutory cap on non-economic damages. Under Md. Code Ann., Cts. & Jud. Proc. § 11-108, claims for non-economic damages are limited to $605,000. *See* § 11-108(b)(2)(i) and (ii). This limitation "shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by and through the victim." *Id.* at § 11-108(b)(3)(i) (emphasis added).

In addition, while the Hoods seek damages for Luke Hood's medical expenses for the remainder of his natural life, Lab Corp. opposes the Hoods' claim on the basis that it is only obligated to pay for Luke Hood's medical expenses through the age of majority.

I decline to rule on these aspects of Lab Corp.'s motion for summary judgment at this time. The Maryland Court of Appeals' answers to the certified questions will determine whether the Hoods have a cause of action against Lab Corp., and whether both Hoods, or only Karen Hood, would be permitted to recover damages. Accordingly, it would be premature to decide what, if any, damages the Hoods are entitled to before these threshold questions are answered.

II.      The Hoods' Motion for Partial Summary Judgment

The Hoods move for summary judgment alleging that Drs. Eisenberg and Brown erred in interpreting the result of a genetic test on Karen Hood's amniocentesis specimen. The Hoods assert that "no rational jury could find that defendants had not breached their duty to correctly interpret and report the genetic test results" and therefore summary judgment on the issue of liability is appropriate. Pl. Mot. Summ J. 4. The Hoods assume that Maryland law determines whether Drs. Eisenberg and Brown had a duty, and breached that duty, with regard to their analysis of Karen Hood's amniocentesis specimen. As explained above, however, the "standard of care exception" to the place-of-the-injury rule would apply North Carolina's law to this case. Because North Carolina does not establish a cause of action for parents who, as the result of an erroneous genomic test, bear a child with a genetic disease, the Hoods would not be able to pursue their claims if this court applies North Carolina law, even if Lab Corp. breached the requisite standard of care. Thus, it would be inappropriate to consider granting summary judgment to the Hoods prior to deciding the choice of law issue.

A separate Order follows.

| June 1, 2006 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |